United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 15, 2005**

Charles R. Fulbruge III
Clerk

In the

# United States Court of Appeals
## for the Fifth Circuit

_____

m 03-60681

_____

YU ZHAO,

Petitioner,

VERSUS

ALBERTO R. GONZALES,
UNITED STATES ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of an Order of
the Board of Immigration Appeals
m A78 129 956

_____

Before SMITH and GARZA, Circuit Judges,
and VANCE,* District Judge.

JERRY E. SMITH, Circuit Judge:

Yu Zhao, a native of the People's Republic of China, attempted to enter the United States illegally. At a hearing before an immigration judge ("IJ"), Zhao applied for asylum and withholding of removal. The IJ refused to withhold removal and denied asylum on the ground that Zhao showed neither past persecution nor a well-founded fear of future persecution.

The Board of Immigration Appeals ("BIA" or "Board") dismissed Zhao's appeal. He filed a motion for reconsideration, contending that his fear of future persecution was reasonable

_____

* District Judge of the Eastern District of Louisiana, sitting by designation.

and that the IJ should have given more weight to certain documentary and testimonial evidence.

Zhao petitioned this court to review the BIA's determinations; he consolidated that petition with the one he had filed before moving for reconsideration. We grant the petition for review and reverse the Board's decision.

I.

Posing as an American citizen, Zhao tried to enter the United States illegally in March 2000. The government issued a Notice to Appear, alleging that Zhao was subject to removal for falsely representing himself as a citizen. Zhao conceded that he was subject to removal but asked for, and was granted, permission to file an application for asylum and withholding of deportation, which he did in July 2000.

At his initial hearing, Zhao attempted to submit, among other things, three contested documents to the IJ: two written notices issued to him from Guantou Town's Village Committee demanding his appearance at the Town Government and a police summons demanding his appearance at the police station. The government objected, arguing that the documents did not conform to 8 C.F.R. § 287.6 (2003), the regulation governing proof of official foreign records.

The IJ agreed with the government but gave Zhao more time to authenticate the documents. In February 2002 the IJ held a hearing on the merits of Zhao's application for asylum and withholding of deportation. Zhao had not authenticated the documents pursuant to § 287.6 by the beginning of that hearing, so the IJ excluded them.

Zhao was the only person to testify at the hearing, but the IJ credited all of his testimony, which established the following: Falun Gong is a movement that professes to help its practitioners gain self-understanding through spiritual and physical development. Zhao started to practice Falun Gong in 1999 to cure his "dizzy spells" and back pain. Zhao began his Falun Gong practice under the tutelege of Master Zhao Kai Feng, a mentor he had known since childhood.

In April 1999, Zhao joined about forty other participants in a silent protest outside the Town Hall for Quanto County in Fujian Province. That protest and Zhao's participation in it were filmed. Later that year, while he was visiting a friend, Zhao's mother told him the police had been looking for him and that authorities had arrested Feng. She cautioned Zhao not to return home.

Zhao bicycled to his aunt's house and hid for several weeks. He then learned that the police had arrested other Falun Gong followers. After hiding out at his aunt's, Zhao traveled by bus to Fuzhou City, where he helped his uncle at a construction site, but this activity was limited, and he was there primarily to "hide out." During his stay in Fuzhou City, Zhao's mother visited him and told of further police visits to their house.

At the end of February 2000, Zhao traveled to Beijing by bus because the government had begun a massive crackdown on Falun Gong practitioners. Zhao's family soon arranged for him to travel to the United States. Zhao found it too difficult to hide in the People's Republic of China because authorities were "hunting down" Falun Gong practitioners everywhere, and he believed the United States would afford him the protection he needed. In March 2000, he traveled to the United States with his fake passport.

2

Since then, Zhao has learned that approximately 200 to 300 Falun Gong practitioners have died during torture and that about 50,000 practitioners have been exiled or sentenced to hard labor without a conviction. He learned that the Chinese authorities had incarcerated some practitioners in mental facilities and injected them with medicine that "mess[ed] up" their nervous systems. Zhao was afraid to return to the People's Republic of China, where he believes the authorities will imprison and torture him.

Zhao practices Falun Gong every morning for twenty to thirty minutes. He has participated in one public, organized Falun Gong activity in the New York/New Jersey area since his arrival there.

After hearing Zhao's testimony, the IJ denied the application for asylum and withholding of deportation. Although the IJ found that Zhao was a credible witness and (grudgingly) that Falun Gong falls within the State Department's operative definition of "religion," the IJ found that Zhao had not established either past persecution or a well-founded fear of future persecution on account of a protected characteristic.

On appeal, the BIA, in a per curiam opinion, affirmed the IJ's decision under 8 C.F.R. § 1003.1(e)(5) (2003). The BIA affirmed the IJ's determination that Zhao had not established past persecution and that his fear of future persecution was not objectively reasonable. The Board also noted that Zhao had "testified that he currently seldom practices Falun Gong and, when he does, he practices in private." The Board found that Zhao had never had any contact with government officials "despite traveling about China for 6 months after the police expressed interest in him."

Zhao timely filed a motion to reconsider, re-urging the arguments he had raised before the IJ and, for the first time, including an appeal of the IJ's exclusion of his three unauthenticated documents. He also sought to submit other items documenting worsening conditions in the People's Republic of China.

In December 2003, the BIA denied reconsideration. It declined to consider the IJ's evidentiary ruling because Zhao had failed to raise it in his initial appeal. Zhao timely petitioned this court to review both the BIA's initial decision affirming the IJ's findings and its denial of his motion to reopen.

II.

Seeking to introduce the unauthenticated documents and the two State Department reports, Zhao contends that the BIA erred in rejecting his motion to reconsider. Although Zhao labels his motion as one for reconsideration, he both re-urges current documents and arguments and seeks to submit new evidence.

Because he seeks to introduce new evidence, his motion is also one to reopen. *See Pierre* v. *INS,* 932 F.2d 418, 421-22 (5th Cir. 1991). These two types of post-judgment motion are distinguished primarily by the fact that a motion for reconsideration does not present new evidence to the BIA. Irrespective of how Zhao labels it, we will consider his motion as both one to reopen and one to reconsider. *See id.* at 422.

A.

We review the denial of a motion to reconsider for abuse of discretion.[1] A motion for re-

_____

[1] *Ghassan* v. *INS*, 972 F.2d 631, 638 (5th Cir. 1992) (citing *Osuchukwu v. INS*, 744 F.2d 1136, (continued...)

3

consideration urges an adjudicative body to re-evaluate the record evidence only. *See Ghassan*, 972 F.2d at 638. Insofar as Zhao's motion was one for reconsideration, his effort fails because he did not identify a change in the law, a misapplication of the law, or an aspect of the case that the BIA overlooked. *See Pierre*, 932 F.2d at 422.

### B.

Zhao sought to reopen the record to introduce two new documents. Those documents are (1) the U.S. Department of Justice International Religious Freedom Reports ("2002 Religious Freedom Reports," issued in October 2002) and (2) the U.S. Department of Justice Country Reports on Human Rights Practices for 2002 ("2002 Country Reports," issued in March 2003).

### 1.

In this circuit, the degree to which 8 U.S.C. § 1252(a)(2)(B)(ii) (2000) precludes judicial review of motions to reopen immigration proceedings is an open question.[2] We have pre-termitted this "thorny" question where there were alternative means of resolving the relevant issues. *See, e.g.*, *Asaad*, 378 F.3d at 474 (declining to reach the issue because the court

lacked jurisdiction for other reasons). We now at last address the issue. Although the parties did not raise or brief this question, we must examine the basis of our subject matter jurisdiction, on our own motion if necessary.[3]

Section 1252(a)(2)(B)(ii) proscribes judicial review of "any . . . decision or action of the Attorney General the authority for which is *specified under this subchapter* to be in the discretion of the Attorney General" (emphasis added). The government does not raise the issue, but there is a question whether § 1252 bars judicial review of all motions to reopen, and we may not exercise appellate jurisdiction that we do not have. In *Medina-Morales v. Ashcroft*, 371 F.3d 520, 528 (9th Cir. 2004), the court held that § 1252(a)(2)(B)(ii) does not impose a complete jurisdictional bar. The instant circumstances present a question that is in all meaningful respects identical, and we agree with the Ninth Circuit's reasoning.

The subsection explicitly excepts asylum determinations, made pursuant to § 1158(a), from its jurisdictional prohibitions. The operative statutory text precludes judicial review of all actions specified as discretionary under that provision's subchapter "other than the granting of relief under section 1158(a) of this title." § 1252(a)(2)(B)(ii). We therefore have two potential sources of appellate jurisdiction: Either (1) Zhao's motion to reopen is a "granting of relief" under §1158(a) or (2) his motion is not specified as seeking discretionary relief under subchapter II of Title 8. We do not consider the first possibility, because we may easily resolve the question in Zhao's favor using the second justification.

---

[1](...continued)
1142-43 (5th Cir. 1984)).

[2] The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-28, 110 Stat. 3009 (1996), implements restrictions on federal court jurisdiction over several categories of BIA decisions. Those restrictions are codified at 8 U.S.C. § 1252 (2004) and govern judicial review of proceedings commencing on or after April 1, 1997. *See Assaad v. Ashcroft,* 378 F.3d 471, 474 n.1 (5th Cir. 2004) (citing *Gormley v. Ashcroft*, 364 F.3d 1172, 1176 (9th Cir. 2004)).

---

[3] See *Hill v. City of Seven Points*, 230 F.3d 167 (5th Cir. 2000) (quoting *Mosley v. Cozby*, 813 F.2d 659, 660 (5th Cir.1987)).

Outside of the § 1158(a) proviso, the text of § 1252(a)(2)(B)(ii) makes plain that we do not have the jurisdiction to review certain discretionary actions of the Attorney General. The law, however, proscribes judicial review of a discretionary action only where it is specified under the subsection of title 8 that governs immigration proceedings.

Before 1996,[4] the authority to reopen a deportation proceeding derived exclusively from a regulation promulgated by the Attorney General, 8 C.F.R. § 3.2(c) (2003).[5] In 8 U.S.C. § 1229a(c)(6) (2004), however, Congress set forth a set of rules governing review of motions to reopen immigration proceedings. That subsection states that an alien may file one such motion, § 1229a(c)(6)(A); specifies that the motion shall "state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material," § 1229a(c)(6)(B); and sets forth relevant deadlines, § 1229a(c)(6)(C). These provisions, however, only set forth the standards for evaluating a motion to reopen; they do not furnish us with a level of deference to afford the Attorney General in making that evaluation.

A federal regulation, 8 C.F.R. § 1003.23(b)(3) (2003), furnishes the quantum of discretion the Attorney General enjoys when entertaining motions to reopen. That regulation provides that an "Immigration Judge has discretion to deny a motion to reopen even if the moving party has established a prima facie case for relief." *Id.*

One might mistakenly read § 1252(a)(2)-(B)(ii) as stripping us of the authority to review any discretionary immigration decision. That reading, however, is incorrect, because § 1252(a)(2)(B)(ii) strips us only of jurisdiction to review discretionary authority *specified in the statute*. The statutory language is uncharacteristically pellucid on this score; it does not allude generally to "discretionary authority" or to "discretionary authority exercised *under this statute,*" but specifically to "authority for which is *specified under this subchapter* to be in the discretion of the Attorney General." *Id.* (emphasis added).

In ruling on Zhao's motion, however, the BIA exercised no such statutorily delineated discretion; that discretion instead derived from regulations promulgated by the Attorney General. One might argue that the statute authorizes such a regulatory delegation of discretion and that the underlying activity should therefore be immune from our scrutiny, but such a construction would belie Congress's conspicuous selection of the phrase "specified under this subchapter." Aware that there is some caselaw from other circuits to the contrary, we conclude that we have authority to review the motion to reopen.[6]

---

[4] This is the year in which Congress passed the IIRIRA.

[5] *See INS* v. *Doherty*, 502 U.S. 314, 322 (1992); *Lara* v. *Trominski*, 216 F.3d 487, 496 (5th Cir. 2000).

[6] Two cases, in particular, are in tension with our holding here and that in *Medina-Morales*. *See Yerkovich v. Ashcroft*, 381 F.3d 990 (10th Cir. 2004); *Onyinkwa v. Ashcroft*, 376 F.3d 797, 799-800 (8th Cir. 2004). We disagree with the analysis these cases present regarding whether a *regulation*, as opposed to a *statute*, may be the source of discretion sufficient to foreclose judicial review.

*Onyinkwa*, *id.* at 799-800, addresses the distinction between statutory and regulatory authority for discretion in a single sentence: "Since a regulation implementing subchapter II specifies that
(continued...)

5

In exercising that authority, we review the BIA's denial of a motion to reopen or to reconsider under a highly deferential abuse-of-discretion standard.[7] Our standard of review is the same irrespective of whether the petitioner seeks withholding of deportation or makes an asylum request.[8] With regard to how we actually apply this standard to the Board's denial of a motion to reopen,

> [t]he standard is whether the Board has acted within the bounds of an abundant discretion granted it by Congress. It is our duty to allow [the] decision to be made by the

Attorney General's delegate, even a decision that we deem in error, so long as it is not capricious, racially invidious, utterly without foundation in the evidence, or otherwise so irrational that it is arbitrary rather than the result of any perceptible rational approach.

*Pritchett*, 993 F.2d at 83 (5th Cir. 1993) (quoting *Osuchukwu v. INS*, 744 F.2d 1136, 1141-42 (5th Cir. 1984) (alterations in original)).

2.

In *Doherty*, the Court held that "[m]otions for reopening of immigration proceedings are disfavored for the same reasons as are petitions for rehearing and motions for a new trial on the basis of newly discovered evidence." *Doherty*, 502 U.S. at 323 (citing *Abudu*, 485 U.S. at 107-08). Indeed, 8 C.F.R. § 1003.2-(c)(1) states that "[a] motion to reopen proceedings shall not be granted unless it appears to the Board that the evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing . . . ."

The Board did not abuse its discretion in refusing to reopen the record to admit the unauthenticated documents. Those documents had been presented before the IJ, who excluded them, and Zhao failed to contest this ruling on direct appeal. Although the documents are material, § 1003.2(c)(1) is stated in the conjunctive, and the documents were plainly available and considered in the hearing before the IJ.

The BIA's failure to re-open the record to admit the 2002 International Freedom Reports and the 2002 Country Reports, however, rests on far more precarious logic. The BIA dispenses, in a single sentence, with Zhao's at-

---

[6](...continued) power to grant continuances is within the discretion of immigration judges, under the IIRIRA courts generally have no jurisdiction to review the exercise of that discretion." We decline to endorse an interpretation whereby any statutorily authorized regulation conferring discretion necessarily forecloses judicial review. Such a reading is contrary to Congress's language and has adverse policy consequences.

*Yerkovich* does not even mention the distinction between a statute and a regulation furnishing discretionary authority. The court quotes *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999), in support of the proposition that a motion to reopen cannot be subject to judicial review. *Van Dinh* itself, however, misstates the statutory text, omitting the phrase "the authority for which is specified" before "under this subchapter." By selectively (or inadvertently) omitting this language, the *Yerkovich* and *Van Dinh* courts analyze statutory language that Congress did not adopt.

[7] *Lara*, 216 F.3d at 496 (citing *Doherty*, 502 U.S. at 322-23; *Pritchett v. INS*, 993 F.2d 80, 83 (5th Cir. 1993)).

[8] *See Doherty*, 502 U.S. at 323 (quoting *INS v. Abudu*, 485 U.S. 94, 99 n.3 (1988)).

tempt to reopen the record to admit these documents: "To the extent that [Zhao] seeks reopening for the submission of previously unavailable evidence, we find insufficient cause to reopen, as [Zhao's] new evidence largely repeats the extensive country condition information already in the record." As we overturn this ruling, we take full account of the broad discretion delegated to the Board in adjudicating these motions. Here, however, the Board erred egregiously in its conclusion.

The Board requires an applicant to provide corroborating evidence where it is reasonable to do so. Specifically, "general background information about a country, where available, *must be included in the record* as a foundation for the applicant's claim." *Matter of S-M-J*, 21 I. & N. 722, 724 (1997) (emphasis added).

The IJ issued her decision on February 5, 2002, before publication of the 2002 International Freedom Reports and the 2002 Country Reports. Although *S-M-J* deals with an asylum applicant's failure to include crucial background documentation, it would be a bizarre policy indeed to require the applicant to provide the Country Reports before the issuance of an IJ's final order, but categorically to refuse to allow him to introduce them, once they become available, on a motion to reopen. That is not to say that *any* or even a *substantial variety* of documentation should require the BIA to reopen asylum proceedings, but it is to say that, in the name of legal consistency, there must be some situations in which the content of the new documentation requires that result.

The government argues, as the BIA reasoned, that the 2002 Country Reports do not justify reopening the record because they merely restate the conditions described in the 1999 Country Reports. Here the government is somewhat disingenuous. When, at oral argument, the government sought to rebut the contention that the Chinese government persecutes mere practitioners of Falun Gong, it reminded us that evidence regarding Chinese persecution of non-leaders was contained in the 2002 Country Reports, not the 1999 reports. The government cannot simultaneously argue that, on the one hand, the 2002 Country Reports contain a crucial piece of evidence that is absent from the 1999 Country Reports in the record and, on the other, that the two new documents are redundant.

According to the Department of State International Religious Freedom Report 2002,

> Since the [Chinese] Government banned the [Falun Gong] in 1999 and began a comprehensive nationwide repression of the movement, *the practice of Falun Gong or possession of its literature has been sufficient grounds for practitioners to receive punishment ranging from loss of employment and education opportunities to imprisonment*. Some Falun Gong members have been tortured in custody and there have been reports that several hundred or more Falun Gong adherents have died in detention since 1999. Falun Gong members who "disrupt public order" or distribute publications may be sentenced to 3 to 7 years in prison . . . .

(Emphasis added.) The next paragraph of that document adds that "[e]ven [non-protesting] practitioners . . . were forced to attend [anti-Fulon Gong] classes. Those who refused to recant their belief . . . were sent to reeducation-through-labor camps, where, in some cases, beatings and torture were used to force them to recant their beliefs."

7

The 2002 Country Reports echo this description of lower-level practitioners' treatment: "Since the [Chinese] Government banned the [Falun Gong] in 1999, the mere belief in the discipline (and since January, *even without any public manifestation of its tenets*) has been sufficient grounds for practitioners to receive punishment ranging from loss of employment to imprisonment." (Emphasis added.)

If the position of the United States Government is that the record evidence introduced at the initial administrative hearing does not demonstrate that mere practitioners were the objects of Chinese government persecution, then the previously unavailable documents Zhao sought to introduce into the record must be admitted on a motion to re-open, because they establish precisely that crucial proposition.[9] The BIA abused even its abundant discretion in failing to allow the documents to be introduced.[10]

---

[9] Alternatively, if the government's position is that the 1999 Country Reports suggest all of this information, then we would be forced to hold, based only on a review of the existing record, that it abused its discretion.

[10] Zhao contends that the IJ erred as a matter of law when she excluded his three supporting documents under 8 C.F.R. § 287.6. This argument is distinct from Zhao's assertion that the BIA erred in refusing to reopen the record to admit these same documents; accordingly, it is subject to a different analysis. We need not resolve this question, however, because (1) the current record does not demonstrate the steps, if any, that Zhao took to authenticate the documents; and (2) we grant Zhao's petition and reverse the Board on the record evidence and the supplementary documents Zhao first sought to introduce on his motion to reopen.

III.

Under 8 U.S.C. § 1158(a) (2004) the Attorney General enjoys authority to grant asylum to any alien who qualifies as a refugee under § 1101(a)(42)(A). For purposes of this statute, a refugee is

> any person who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution *or* a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

8 U.S.C. § 1101(a)(42)(A) (emphasis added).

The decision to grant or deny asylum involves two components. First, the alien must demonstrate that he has been persecuted or has a well-founded fear of persecution on account of one of the factors listed in § 1101(a)-(42)(A).[11] That the alien qualifies as a refugee under the statute does not, however, automatically entitle him to asylum. The language of § 208 is precatory, and the decision to grant or deny asylum is within the IJ's discretion.[12]

The IJ found that there was no evidence of past persecution and that Zhao's credited testimony was legally insufficient to establish a well-founded fear of future persecution. Specifically, the IJ found that Zhao had presented no evidence that any Chinese government official ever confronted him at any time for any reason. The IJ did not question Zhao's verac-

---

[11] *See Mikhael*, 115 F.3d at 303; *Faddoul v. INS*, 37 F.3d 185, 188 (5th Cir. 1994).

[12] *Mikhael,* 115 F.3d at 303; *Faddoul*, 37 F.3d at 188.

ity but stated that "Zhao simply failed to make his case." That the IJ did not doubt Zhao's testimony is significant, because we must accept as true all the facts to which Zhao testified. The question is merely the interpretation and legal sufficiency of those facts.

### A.

We use the substantial evidence standard to review the IJ's factual conclusion that an alien is not eligible for asylum. *See Chun*, 40 F.3d at 78 (citing *Adebisi*, 952 F.2d at 912). Under substantial evidence review, we cannot reverse the BIA's factual determinations unless we decide "not only that the evidence supports a contrary conclusion, but also that the evidence *compels* it." *Id.* (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992)). The alien must prove that the evidence is so compelling that no reasonable factfinder could reach a contrary conclusion. *See id.* "[I]t is the factfinder's duty to make determinations based on the credibility of the witnesses." *Id.* (citing *Vazquez-Mondragon v. INS*, 560 F.2d 1225, 1226 (5th Cir. 1977)). We will not substitute our judgment for that of the BIA or IJ "with respect to the credibility of witnesses or ultimate factual findings based on credibility determinations." *Id.*

### 1.

There is no error in the IJ's determination that Zhao has failed to demonstrate past persecution. Zhao points to no evidence that the government ever arrested, detained, interrogated, or harmed him or his family. *See Faddoul*, 37 F.3d at 188. As the IJ noted, there is no evidence in the record that a government official ever confronted Zhao because of his involvement in Falun Gong.

### 2.

To establish a well-founded fear of future persecution, an alien must demonstrate "a sub-

jective fear of persecution, and that fear must be objectively reasonable." *Eduard v. Ashcroft*, 379 F.3d 182, 189 (5th Cir. 2004) (quoting *Lopez-Gomez v. Ashcroft*, 263 F.3d 442, 445 (5th Cir. 2001)). The INA does not define persecution, but we have described it as "[t]he infliction of suffering or harm, under government sanction, upon persons who differ in a way regarded as offensive (e.g., race, religion, political opinion, etc.), in a manner condemned by civilized governments." *Abdel-Masieh v. INS*, 73 F.3d 579, 583-84 (5th Cir. 1996). "The harm or suffering need not be physical, but may take other forms, such as the deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment or other essentials of life." *Id.* The applicant, however, need not provide evidence that he would be singled out for persecution, if

> (A) [he] establishes that there is a pattern or practice in [his] country . . . of persecution of a group of persons similarly situated . . . on account of race, religion, nationality, membership in a particular social group, or political opinion; and

> (B) [he] establishes [his] own inclusion in, and identification with, such a group of persons such that [his] fear of persecution upon return to that country is reasonable.

8 C.F.R. § 208.13(b)(2)(iii)(A)-(B) (2003). There are therefore two different ways for Zhao to prove the objectivity of his persecution claim. First, he can show that he would be singled out for persecution. Alternately, he can satisfy the two prongs of § 203.13(b)-(2)(iii).

The IJ explicitly credited Zhao's testimony, so Zhao's possession of a subjective fear is not at issue. With regard to the well-founded fear

9

of future persecution, the alien's "subjective fear will satisfy this standard if 'a reasonable person in [his] circumstances would fear persecution if [he] were to be returned to [his] native country.'" *Faddoul*, 37 F.3d at 188 (quoting *Guevara Flores v. INS*, 786 F.2d 1242, 1249 (5th Cir. 1986)). This standard, however, does not require Zhao to demonstrate that he *will* be persecuted on returning to the People's Republic of China. It requires a lesser showing of certaintySShe must show "to a reasonable degree" that his return there would be intolerable. *See Eduard*, 379 F.3d at 189 (citing *Mikhael*, 115 F.3d at 305)) (internal quotation marks omitted).

This court regards the reasonableness inquiry as one into both subjective and objective fear. To establish the objective reasonableness of a well-founded fear of future persecution, the alien must prove that

(1) he possesses a belief or characteristic a persecutor seeks to overcome by means of punishment of some sort; (2) the persecutor is already aware, or could become aware, that the alien possesses this belief or characteristic; (3) the persecutor has the capability of punishing the alien; and, (4) the persecutor has the inclination to punish the alien.

*Eduard*, 379 F.3d at 191 (citing *Matter of Mogharrabi*, 19 I & N Dec. 439, 446 (BIA 1987)).

Two further legal points merit repeating. First, the test does not require Zhao to prove that he had been personally targeted, because such an interpretation would render the future persecution inquiry redundant of the past persecution analysis. *See id.* at 192. Second, Zhao need not prove that the Chinese government was *actually aware* that he was a Falun

Gong practitioner (although it is fairly certain from the record that it was), but merely that that government easily could become aware of such status. *See id.* at 192-93.

With regard to Zhao's alleged fear of future persecution, the IJ found that

[t]he respondent argues that he is concerned about the future persecution. However, the respondent also has indicated that he has not been very much involved in the practice of the spiritual exercise. In fact, he indicated in his initial testimony that he didn't have time because he's studying and trying to better himself. He had an education.

That passage is the extent of the IJ's finding concerning Zhao's alleged fear of future persecution on returning to the People's Republic of China. In determining the objective justification for that fear, the IJ focused solely on Zhao's Falun Gong practice in the United States.

In essence, the IJ reasoned that Zhao could not have a well-founded fear of future persecution because he seldom practices Falun Gong publicly in New York. Zhao argues that the IJ drew the wrong conclusions from the record testimony and failed to consider other testimony that supports his claim. Noting the self-evident flaws in the IJ's apparent inferences, we agree.

With respect to the first element of the reasonableness inquirySSwhether the applicant possesses a belief or characteristic that a persecutor seeks to overcome by means of punishment of some sortSSthe government does not dispute that Zhao is a Falun Gong practitioner. The IJ explicitly notes that Falun Gong fits within the statutory meaning of the word

10

"religion." In her mystifying analysis, the IJ infers from Zhao's infrequent public Falun Gong participation that he no longer qualifies for protection under the statute.

This reasoning is deeply flawed. Zhao's testimony establishes that his participation in public Falun Gong activities was not an accurate proxy for his actual fidelity to the practice. He continued to practice Falun Gong in private almost every day. The 1999 Country Reports establish that the Chinese government indeed targeted Falun Gong practitioners for punishment. The 2002 Country Reports are even more explicit on this score.[13]

With respect to the second element of the reasonableness inquirySSwhether the People's Republic of China is already aware, or could become aware, that the applicant possess this belief or characteristicSSthe record also establishes that Zhao meets his burden. The record is replete with uncontroverted testimony both (1) that in his hometown, Zhao participated publicly in Falun Gong activities and (2) that the local authorities visited his house to look for him on several occasions.

The government urges us not to connect the various dots—(1) that Zhao was videotaped partaking in a Falun Gong demonstration; (2) that Falun Gong practitioners are objects of Chinese government persecution; (3) that Zhao's master was arrested; and (4) that the police visited Zhao's home looking for him. Although the original record does not contain direct evidence that the authorities were seeking out Zhao because of his Falun Gong participation, that inference is unavoidable in light of Zhao's credited, uncontroverted testimony. Moreover, Zhao need not rely on the unauthenticated documents to support the inference.

With respect to the third and fourth elements, the supplemental documentation establishes not only that the Chinese government has the capability and inclination to punish Falun Gong practitioners, but also that it has already done so. Those facts require no further elaboration here.[14] The two sets of Country Reports confirm that the People's Republic of China is capable of, and intends to, crack down on Falun Gong practitioners.

---

[13] We present much of this information in the discussion of Zhao's motion for reconsideration. For example, according to the Department of State International Religious Freedom Report 2002,

> [s]ince the [Chinese] Government banned the [Falun Gong] in 1999 and began a comprehensive nationwide repression of the movement, the practice of Falun Gong or possession of its literature has been sufficient grounds for practitioners to receive punishment ranging from loss of employment and education opportunities to imprisonment. Some Falun Gong members have been tortured in custody and there have been reports that several hundred or more Falun Gong adherents have died in detention since 1999. Falun Gong members who "disrupt public order" or distribute publications may be sentenced to 3 to 7 years in prison . . . .

(Emphasis added.)

---

[14] The 1999 Country Reports explain that in July of that year the government of the People's Republic of China initiated a crackdown against the movement, imprisoning thousands and beating those who refused to recant their beliefs. The two Houses of Congress unanimously passed a concurrent resolution condemning those actions. As discussed above, the 2002 Country Reports, which the BIA should have re-opened the record to include, make evident that the Chinese government employed these tactics against not only core leaders but also mere practitioners.

At oral argument the government took the position that, although the Chinese government may punish mere Falun Gong practitioners (rather than leaders) administratively, such penalties do not amount to persecution within the meaning of the statute. First, the 2002 Country Reports reveal the government's contention at oral argument to be inconsistent with the Attorney General's assessment that even lower level practitioners are punished.[15] Second, the government is reading into the 1999 Country Reports a clean distinction between leaders and mere practitioners where, in fact, that distinction does not exist. Third, the government cites no support for this proposition, which flies in the face of common sense when we consider that the "administrative" penalties include severe fines, imprisonment, and torture.

The BIA's opinion seems to premise denial on three major considerations: (1) that Zhao now rarely practices Falunn Gong publicly; (2) that he had no "direct contact with government officials"; and (3) that he was able to travel freely about the People's Republic of China for six months after the police expressed interest in him. As we have said, the frequency with which Zhao now practices Falun Gong publicly bears no relationship to how likely the Chinese government is to persecute him on his potential return.

The BIA's statement that Zhao did not have direct contact with government officials is equally delphic—the reason Zhao did not come into direct contact with Chinese officials is that he was evading them. Such lack of contact may militate against a finding of *past* persecution, but that is not the argument on which Zhao's application stands.

The IJ cites Zhao's lack of contact with government officials as though one can reasonably infer that they were not looking for him. The record, however, is replete with uncontroverted testimony that Zhao was fleeing the authorities on discovering that they were searching for him.

Finally, the characterization of Zhao as "traveling" about the People's Republic of China for six months is misleading and borders on being disingenuous. The record establishes that for that entire period of time, Zhao was either fleeing the authorities or hiding. Although the record indicates that Zhao did work while he was at his uncle's construction site, it is equally obvious that he was there primarily to evade the authorities. The BIA therefore abused its discretion in ruling that Zhao did not have the well-founded fear of future persecution necessary to sustain an asylum claim.

IV.

An alien who fears persecution if returned to a particular country has two potential sources of relief under the INA: asylum and withholding of removal. A grant of asylum permits the alien to remain in this country; a withholding of removal forbids his removal to the persecuting country.[16] A grant of asylum is within the Attorney General's discretion, but restriction on removal is granted to qualified aliens as a matter of right. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 424 (1987). We grant Zhao's asylum application, so we need not consider the removal issue.[17]

---

[16] *See* INA §§ 208 & 241(b)(3), codified at 8 U.S.C. §§ 1158, 1231(b)(3).

[17] Because we resolve the case on other grounds, we do not reach Zhao's due process (continued...)

---

[15] See *supra* note 13 and part II.B.2.

## V.

The Attorney General enjoys significant discretion in making asylum determinations. That authority, however, is not plenary. The IJ credited all of Zhao's testimony but interpreted it in such a way that allowed her to rule against him on grounds of legal sufficiency. The IJ's summary of Zhao's testimony consists entirely of conclusory remarks, mischaracterizations of various events, and non-sequiters.

The BIA rubber-stamped the IJ's ruling and then dismissed (in a single sentence), as redundant, the detailed corroborating materials Zhao submitted in his motion to reopen. Zhao's testimony, if true, is likely sufficient to justify our decision to grant his petition and overturn the BIA. Once we consider the documentation excluded in error, however, the decision is an easy one. The Attorney General's discretion is not so broad so as to allow him to reject asylum applications without a logical explanation.

Ordinarily, upon allowing reopening of the record, we would remand the persecution question to the BIA. *See INS v. Ventura*, 537 U.S. 12, 16-17 (2002).[18] The circumstances here, however, differ from those appellate courts generally confront in reviewing a motion to reopen. In *Ventura*, for example, the BIA had not considered the changed country conditions argument at all. *See id.* Here, to the contrary, the Board has already rejected the "changed country conditions" proposition, so our ruling on the persecution issue does not usurp the Board's authority to rule on it first.[19] Moreover, although the language in *Ventura* is strong, it remains precatory. The Court could have worded its holding categorically, and its failure to do so must be a conscious decision. We cautiously conclude that this case exhibits the narrow set of circumstances that requires no remand.[20]

---

[17](...continued)
claims.

[18] The specific language in *Ventura* is worth noting:

Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands. This principle has obvious importance in the immigration context. The BIA has not yet considered the "changed circumstances" issue. And every consideration that classically (continued...)

[18](...continued)
supports the law's ordinary remand requirement does so here. The Agency can bring its expertise to bear upon the matter; it can evaluate the evidence; it can make an initial determination; and, in doing so, it can, through informed discussion and analysis help a court later determine whether its decision exceeds the leeway that the law provides.

*Ventura*, 537 U.S. at 16-17.

[19] The final sentence of the BIA's opinion reads: "To the extent that the respondent seeks reopening for the submission of previously unavailable evidence, we find insufficient cause to reopen, as the respondent's new evidence largely repeats the extensive country condition information already in the record." The BIA had already determined that, based on the record evidence *sans* supplemental reports, Zhao had no well-founded fear of future persecution.

[20] We also note that in *Ventura*, 537 U.S. at 17-18, the Court explicitly stated that the State Department report on which the Ninth Circuit had relied was equivocal with respect to the relevant (continued...)

13

The petition for review is GRANTED, and the order of the BIA is REVERSED. This matter is remanded to the BIA for any further necessary proceedings in accordance with this opinion.

ENDRECORD

---

[20](...continued) country conditions. Similar equivocation is absent in the State Department and Religious Freedom reports that constitute Zhao's evidence of "changed country conditions" for Falun Gong in the People's Republic of China.

EMILIO M. GARZA, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's well-reasoned decision, except for its final resolution. The majority correctly notes that "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Ventura*, 537 U.S. at 16. However, this case does not present the court with "rare circumstances" that would warrant granting asylum without first remanding the case to the BIA for further review. While the BIA did consider the "changed country conditions," it did so only in the context of the motion to reopen. The BIA was never given an opportunity to "bring its expertise on the matter; [to] evaluate the evidence; and . . . [provide an] informed discussion and analysis" on these changed circumstances as they relate to Zhao's actual asylum claim. *Id* at 17. As a result, the majority has "seriously disregarded the agency's legally mandated role." *Id*. The more prudent and proper approach is to reverse the BIA's order denying Zhao's motion to reopen, and to remand the case to the BIA for additional investigation or explanation.

Accordingly, I respectfully DISSENT IN PART.