# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
January 12, 2023

Lyle W. Cayce
Clerk

No. 21-60160

Rafael Escobar-Verdecia,

*Petitioner*,

*versus*

Merrick Garland, *U.S. Attorney General*,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals
BIA No. A213 160 308

Before Richman, *Chief Judge*, and Elrod and Oldham, *Circuit Judges*.
Per Curiam:*

Rafael Escobar-Verdecia, a native and citizen of Cuba, seeks asylum, withholding of removal, and protection under the Convention Against Torture. Escobar-Verdecia complains of egregious treatment at the hands of the Cuban government. After both the Immigration Judge and the Board of Immigration Appeals denied relief, he filed a petition for review in this court.

---

* This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 21-60160

Because Escobar-Verdecia fails to show any reversible error by the BIA, we DENY in part and DISMISS in part the petition for review.

I

Escobar-Verdecia arrived in the United States in June 2019 and was shortly afterward detained by the Department of Homeland Security for illegal entry. As Escobar-Verdecia tells it, he fled Cuba because the government had been targeting him for his anti-communist political commitments. For example, he alleges that in 1996, the Cuban government took away his teaching job because he would not participate in a pro-government march. As a result, he had to become a food processor and seller. He contends that the job came with persistent, arbitrary fines levied against him.

Escobar-Verdecia also asserts that he was subjected to threats and physical violence by the Cuban government. He testified during his hearing before the IJ that he was detained and threatened with violence at least three times by the Committees for the Defense of the Revolution, a branch of the government created to plant informants in Cuban communities.

By his telling, the series of events giving rise to his seeking asylum in the United States began sometime between September and November of 2018, when the Committees were drafting a bill for the new Cuban constitution. The President of the Committees and the Police Chief told Escobar-Verdecia that if he did not support the draft bill and vote in the February 2019 election, the Committees were going to "incriminate [him] as a worm and as a counterrevolutionary."[1]

---

[1] In Cuba, 'gusano' (worm) is a derogatory term used widely to describe those perceived to be in opposition to the government, critical of revolutionary ideology, or spies of the USA.

No. 21-60160

Escobar-Verdecia did not vote in the February election. Consequently, on the next day, the Committees President and the Police Chief took Escobar-Verdecia from his home and brought him to a Committees meeting. At the meeting, the Committees members accused him of being a counterrevolutionary. And when he still refused to support the new bill, saying that the Cuban constitution "was all based on a lie," the Committees members handcuffed him and detained him in the police jail. During his detention, he contends that he was thrown to the floor, beaten, hit on the face until his lip split open, spit on, and prevented from sleeping by having cold water thrown at him. He testified that the Cuban police agreed to release him on the condition that if they found him involved in any other counterrevolutionary activities, they would jail him again or "make [him] disappear." Upon release, he received hospital treatment for his injuries.

Later, in March 2019, the Committees found counterrevolutionary posters painted throughout Escobar-Verdecia's neighborhood. In response, the government officers conducted a search of his home and found talc powder, which can be mixed with water to make paint. Treating this as evidence that Escobar-Verdecia painted the counterrevolutionary posters, the police officers took him back to the same jail where he had been previously detained. They deprived him of food, sleep, and air conditioning, and they gave him water only once. The police questioned him "at all moments," attempting to get him to confess to painting the posters, but he refused to confess. After two days, the police released him. They warned him that if any more posters appeared in the community, they would attribute the violation to him.

Around two months later, Escobar-Verdecia fled Cuba while his wife and daughters remained. Escobar-Verdecia arrived in the United States illegally several weeks later. Shortly after, he was detained by the Department of Homeland Security. The DHS served him with a Notice to

No. 21-60160

Appear before an IJ and charged him as removable. Escobar-Verdecia admitted to the factual allegations of his entrance into the United States and conceded his charge of removal. He subsequently submitted applications for asylum, withholding of removal, and protection under the Convention Against Torture.

The IJ denied Escobar-Verdecia's applications. First, the IJ determined that Escobar-Verdecia was not credible, and thus was not entitled to the presumption of a well-founded fear of persecution. Next, the IJ determined that, credibility aside, Escobar-Verdecia failed to corroborate a well-founded fear because he failed to establish that he had either faced persecution in the past or was likely to experience such persecution in the future.

After considering the available evidence, the IJ denied all three applications. On the asylum claim, the IJ held that even though his "detention was unpleasant, there is insufficient evidence to demonstrate he suffered brutal conditions during that detention" that could justify granting asylum. Regarding the fines, the IJ determined that "the evidence supports a finding [that] the respondent was repeatedly fined for various violations of law in Cuba," rather than as a form of retaliation for his political beliefs or religion. The IJ dismissed the withholding of removal claim because Escobar-Verdecia "did not satisfy the lower burden of proof required for asylum," and "failed to satisfy the clear probability standard of eligibility required for withholding of removal." Finally, the IJ determined that because Escobar-Verdecia's CAT claim was "identical to his claim for asylum," and because the bar for showing probability of torture is even higher than for showing probability of persecution, his claim under CAT necessarily fails. Because the IJ rejected all three claims, the IJ ordered him to be removed from the United States to Cuba.

No. 21-60160

Escobar-Verdecia appealed to the BIA. While his appeal was pending, he also submitted a motion to remand to the IJ for consideration of new evidence, which included statements from his wife and copies of summonses issued by the Cuban police. After considering Escobar-Verdecia's arguments, the BIA dismissed the appeal and denied the motion. First, the BIA determined that the IJ was correct in holding that Escobar-Verdecia did not meet his burden of proof for asylum. The BIA held that having "at least two arrests and detentions, which included no serious physical injuries, did not rise to the level to constitute persecution." On his alleged financial harm, the BIA held that it was proper for the IJ to find "that the numerous fines levied against the respondent were related to food safety violations by his business, and [were] not on account of his political opinion." The BIA also held that it was not clearly erroneous for the IJ to find that Escobar-Verdecia "submitted insufficient evidence that he is being sought by Cuban authorities, or is under threat of arrest, because of any political animus against him." And because the denial of withholding of removal under the statute "is governed by a more stringent burden of proof" than the asylum claim, the BIA summarily dismissed that part of the appeal as well.

Next, the BIA affirmed the IJ's denial of relief under CAT because Escobar-Verdecia's evidence of *prior* harm did not rise to the level of "torture" under 8 C.F.R. § 1208.18(a) and because his evidence of *future* harm was merely "speculative." Finally, the BIA denied Escobar-Verdecia's motion to remand for consideration of new evidence because the evidence sought to be presented was previously available. He timely filed a petition for review to this court.

II

As a preliminary matter, this court lacks jurisdiction to consider issues that were not raised before the BIA. *See* 8 U.S.C. § 1252(d)(1); *Omari v.*

5

*Holder*, 562 F.3d 314, 318 (5th Cir. 2009) ("Petitioners fail to exhaust their administrative remedies as to an issue if they do not first raise the issue before the BIA . . . ."). And motions for reconsideration must be filed with the BIA if the BIA's decision itself creates a new issue that it could address. *Martinez-Guevara v. Garland*, 27 F.4th 353, 360 (5th Cir. 2022). Escobar-Verdecia did not file any motions for reconsideration with the BIA.

Thus, we lack jurisdiction to consider the following unexhausted issues: (1) whether the IJ's opinion lacked sufficient legal and factual analysis to permit the BIA to review the propriety of the IJ's decision; (2) whether the BIA erred by failing to address Escobar-Verdecia's challenge to the IJ's finding that he was not credible; and (3) whether the Cuban government has a "pattern or practice" of persecuting individuals similarly situated to him.

Furthermore, we do not consider issues that have been either explicitly abandoned or abandoned through deficient briefing. *See Soadjede v. Ashcroft*, 324 F.3d 830, 833 (5th Cir. 2003). The following issues are either explicitly abandoned or abandoned through lack of meaningful briefing: (1) whether Escobar-Verdecia is entitled to asylum based on his religion (explicitly abandoned on appeal to the BIA); (2) whether he is entitled to withholding of removal under the Immigration and Nationality Act (explicitly abandoned on appeal to the BIA and conceded at oral argument); (3) whether Escobar-Verdecia is entitled to relief under the regulations implementing the Convention Against Torture (abandoned through lack of meaningful briefing and conceded at oral argument); and (4) whether the BIA erred in denying Petitioner's motion to remand to the IJ for consideration of new evidence (abandoned through lack of meaningful briefing).

Thus, the only remaining issue is whether the BIA erred in denying Escobar-Verdecia's political-asylum claim. In considering Escobar-Verdecia's appeal, the BIA noted the IJ's finding that Escobar-Verdecia is

not credible. Nonetheless, the BIA analyzed the facts as "described by [Escobar-Verdecia]" and upheld the IJ's determination that he is not entitled to political asylum. We do the same here.

### III

The standard of review governing BIA denials of asylum is well established. "[T]his court has the authority to review only the BIA's decision, not the IJ's decision, unless the IJ's decision has some impact on the BIA's decision." *Wang v. Holder*, 569 F.3d 531, 536 (5th Cir. 2009). "However, this court may review the IJ's findings and conclusions if the BIA adopts them." *Id.* Factual findings are reviewed under the substantial-evidence standard, while legal questions are reviewed *de novo*. *Zhu v. Gonzales*, 493 F.3d 588, 594 (5th Cir. 2007). Under the substantial-evidence standard, reversal is improper unless this court decides "not only that the evidence supports a contrary conclusion, but that the evidence *compels* it." *Zhao v. Gonzales*, 404 F.3d 295, 306 (5th Cir. 2005) (citation omitted). Escobar-Verdecia "must prove that the evidence is so compelling that no reasonable factfinder could reach a contrary conclusion." *Id.* (citation omitted).

### IV

Under the deferential substantial-evidence standard, we are unable to grant the petition for review of Escobar-Verdecia's political-asylum claim because the record evidence does not "'compel[]' a conclusion contrary to the [BIA]'s determination." *Gjetani v. Barr*, 968 F.3d 393, 396 (5th Cir. 2020) (quoting *Zhao*, 404 F.3d at 306). "Asylum is available to a 'refugee' at the discretion of the government." *Id.* (quoting 8 U.S.C. § 1158(b)(1)). A refugee is "any person . . . who is unable or unwilling to return to . . . [his] country because of persecution or a well-founded fear of persecution on account of [a protected ground]." 8 U.S.C. § 1101(a)(42). Consequently, "[t]o establish eligibility for asylum, [the petitioner is] required to

demonstrate either past persecution or a well-founded fear of future persecution" on account of a protected ground. *Gjetani*, 968 F.3d at 396 (citing 8 C.F.R. § 208.13(b)). Persecution "does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." *Majd v. Gonzales*, 446 F.3d 590, 595 (5th Cir. 2006). To count as persecution, the mistreatment must "be 'systemic, pervasive, or organized.'" *Gjetani*, 968 F.3d at 398 (quoting *Lie v. Ashcroft*, 396 F.3d 530, 537 (3rd Cir. 2005)). Thus, "even those subject to brutal physical attack are not necessarily victims of 'persecution.' Courts have condemned all manner of egregious and even violent behavior while concluding they do not amount to persecution." *Id.* (collecting cases).

Escobar-Verdecia argues that the various mistreatments he suffered constitute past persecution and create a well-founded fear of future persecution. As support, he asserts that the fines levied by the Cuban government for his alleged violation of food safety law were mere pretense for punishing him for his political beliefs. He also points out that he suffered extensive abuse during his detention, including "severe beatings by police officers" and "being awakened with freezing cold water." These "cumulative harms," he argues, "rise[] to the level of persecution" because they were "systemic and sustained . . . over a span of several years."

But "even those subject to brutal physical attack are not necessarily victims of 'persecution,'" *id.*, because persecution requires "a *sustained*, systematic effort to target an individual," *id.* at 397. To illustrate what constitutes persecution, consider *Tamara-Gomez v. Gonzales*, 447 F.3d 343 (5th Cir. 2006), where we held that the petitioner suffered persecution because he was systematically hunted down by a guerilla militia. In that case, Tamara-Gomez was confronted and threatened by a guerilla member because he assisted the Colombian National Police in a mission. *Id.* at 348. Within a short amount of time, the guerilla group had located him, obtained his cell

phone number, and identified the names of his wife and children. When Tamara-Gomez relocated out of fear, the group followed him. "[I]n addition to threatening calls, [his wife] received demands for money, death threats to her husband, and threats to kidnap her two sons . . . ." *Id.* at 346. And his new home was spray-painted with the militia's symbols. *Id.* at 348.

Unlike the facts in *Tamara-Gomez*, however, the facts presented here do not evince a "systemic, pervasive, or organized" kind of mistreatment. *Gjetani*, 968 F.3d at 398 (citation omitted). With regard to the fines levied by the Cuban government, the evidence does not compel reversal of the BIA's decision that upheld the IJ's finding "that the numerous fines levied against the respondent were related to food safety violations by his business, and [were] not on account of his political opinion." And the several occasions on which Escobar-Verdecia was detained and mistreated—although undoubtedly appalling—do not suggest a "sustained pursuit" that persecution requires. *Id.* Thus, the evidence warrants the IJ's finding that Escobar-Verdecia "submitted insufficient evidence that he [was] being sought by Cuban authorities" because of his political views.

As to his fear of future persecution, Escobar-Verdecia must demonstrate "a subjective fear of persecution, and that fear must also be objectively reasonable." *Eduard v. Ashcroft*, 379 F.3d 182, 189 (5th Cir. 2004) (citation omitted). On this issue, the evidence does not compel reversal of the IJ's finding that Escobar-Verdecia "has not provided sufficient evidence to show that anyone in Cuba is still looking for him or that he is under threat of arrest should he return to Cuba." The Cuban government detained Escobar-Verdecia in connection with specific events: the election and the appearance of counterrevolutionary posters in his neighborhood. He submitted no evidence suggesting that the Cuban authorities continued to target him after those events. Furthermore, "we have often taken note of when, as here, an alien has endured a threat or assault but has nevertheless

No. 21-60160

chosen to stay in his home country for a period of time—because the choice to stay tends to weaken the claim of persecution." *Gjetani*, 968 F.3d at 399 (collecting cases). Escobar-Verdecia stayed for two months after his last detention, and he did not provide any explanation in his brief as to why he chose to do so.

Thus, under the deferential substantial-evidence standard, we are unable to grant the petition for review of Escobar-Verdecia's political-asylum claim because the record evidence does not "'compel[]' a conclusion contrary to the [BIA]'s determination." *Id.* at 396 (quoting *Zhao*, 404 F.3d at 306).

\*     \*     \*

Accordingly, we DENY in part and DISMISS in part the petition for review.