# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-60697

United States Court of Appeals
Fifth Circuit

**FILED**

July 15, 2016

Lyle W. Cayce
Clerk

SEALED PETITIONER,

Petitioner

v.

SEALED RESPONDENT,

Respondent

Petition for Review of an Order
of the Board of Immigration Appeals

Before DAVIS, SMITH, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

Petitioner, a native and citizen of Ethiopia, petitions for review of the decision of the Board of Immigration Appeals ("BIA"), upholding the Immigration Judge's ("IJ") denial of his application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158 and 1231(b)(3). Petitioner arrived in the United States without a valid entry document. He then applied for asylum and withholding of removal under the INA, and protection under the Convention Against Torture ("CAT"). In the subsequent applications and hearings, Petitioner testified that he had been tortured by the Ethiopian government because it suspected he and his family members supported a terrorist organization called the Ogaden National

Liberation Front ("ONLF"). The IJ denied relief because Petitioner did not show that he was persecuted on account of a protected ground as required by §§ 1158 and 1231(b)(3). However, the IJ withheld his removal under CAT. Because the IJ and the BIA did not consider several factors essential to determining whether one central reason for the Ethiopian government's maltreatment of Petitioner was persecution on account of a protected ground, we remand for that consideration.

## I.

## A.

The country of Ethiopia is divided into several regional states based on ethnic and linguistic distinctions. The Somali Regional State lies in the eastern part of the country and is inhabited largely by ethnic Somalis. There is a large clan of ethnic Somalis called the Ogaden who live mainly in five of the Somali Regional State's nine zones, including Fik. The ONLF is an armed, violent, and fragmented separatist group that operates in the Somali Regional State and is primarily made up of members of the Ogaden clan. The ONLF interacts regularly with civilians, obtaining food and water from a network of civilian supporters in the towns and villages of the Ogaden area. In 2007, the ONLF attacked an oil installation, which resulted in the capture and death of seventy civilians and Chinese oil workers. In response to that attack, the Ethiopian government created the Liyu police force to carry out a counterinsurgency campaign in the Ogaden area. The ONLF is one of five groups designated as terrorist organizations by the Ethiopian government in June 2011.

Petitioner testified to the following. Petitioner's father owned a grocery store in Fik, a city in which approximately 97% of the population belongs to the Ogaden clan. Petitioner and his family are members of the Ogaden clan. In January 2012, five armed members of the Liyu police force arrived at the

grocery store where Petitioner and his father were present. The Liyu officers accused Petitioner's father of using proceeds from his store to support the ONLF. Petitioner's father denied being an ONLF supporter, but the officers did not believe him. The officers punched, slapped, and kicked Petitioner's father, and hit him with the butts of their rifles. They then arrested him, warning Petitioner to close the store and leave. Petitioner's father was detained at a military camp in Fik for approximately six months without being criminally charged. At the end of the six months, he was killed. Officials at the military camp stated that they shot him during an escape attempt. When Petitioner asked why his father was being detained, he was only told that government officials had a "strong suspicion" that he was an ONLF supporter.

In August 2012, the Liyu police approached Petitioner's maternal uncle, Abdi Yusuf Ali, while he was teaching school and asked Ali to join them in fighting the ONLF. Ali refused, stating that he was a teacher and had no military training. Ali was then arrested, and a week later, he was killed while in detention. When Ali's father, Petitioner's grandfather, went to the camp to find out why Ali had been killed, Petitioner's grandfather was accused of being an ONLF supporter and was arrested. Petitioner's grandfather was still in custody at the police station in Fik at the time of Petitioner's asylum hearing in February 2014.

A year after his father's killing, Petitioner obtained a permit from a city administrator allowing him to reopen his father's grocery store. He worked at the grocery store for approximately one month before three armed Liyu policemen arrived in December 2012 and asked if Petitioner was continuing his father's work of supporting the ONLF. Petitioner responded that he did not support the ONLF and wished only to support his family. In response, the officers beat him, arrested him, and brought him to the same military camp where his father and uncle had been taken.

Petitioner was detained at the military camp for two months and ten days. During that time, two members of the Liyu police force interrogated and physically abused Petitioner approximately six times. The officers punched and slapped Petitioner, and kicked him with their boots. They also hit him with the butts of their rifles, leaving a scar on his forehead. They slashed his neck with a knife, burned toenails on each of his feet with a cigarette lighter, and pulled two toenails from his feet. While the officers were physically abusing Petitioner, they insisted he confess to being an ONLF supporter and give them names of other ONLF supporters in Fik. Petitioner was told that he would remain in custody until he agreed to cooperate with the Liyu police and act as a spy for them. Petitioner agreed and was released. However, he fled the region the next day. Petitioner is not a member of the ONLF, and he does not know any members of the ONLF.

**B.**

Petitioner arrived in the United States in August 2013 without a valid entry document. Upon arrival, he applied for admission in Brownsville, Texas, and was issued a notice to appear for a charge of removability as an immigrant without a valid entry document at the time of his application for admission under 8 U.S.C. § 1182(a)(7)(A)(i)(I). Following his appearance, the IJ ordered he be removed, and Petitioner subsequently filed an application for asylum and withholding of removal under the INA and withholding of removal under CAT. The IJ then conducted several hearings to determine Petitioner's eligibility for relief. The IJ issued an oral decision, denying Petitioner asylum and withholding of removal under the INA, but granting him relief under CAT.

The IJ found that Petitioner had testified credibly and that he had presented corroborating evidence. He acknowledged Petitioner's contention that the Ethiopian government's actions against him were based (1) on a political opinion that the government imputed to him and (2) on his

4

membership in the particular social groups of the Ogaden tribe and of his family. The IJ assumed arguendo that the two claimed groups were particular social groups within the meaning of the INA and that Petitioner was a member of both groups. The IJ did not address whether Petitioner's treatment rose to the level of persecution and instead focused on the reason for the government's interest in Petitioner. He found that the sole reason the Ethiopian government took any action against Petitioner was because it was "attempting to suppress the violent activities of the ONLF and it believed, even if wrongly, that [Petitioner] was a financial supporter of the ONLF like his father was" and that Petitioner "knew supporters of the ONLF in Fik who[m] he could reveal to the government." The IJ cited several cases from this circuit and the BIA stating that investigation of terrorism is not harm perpetrated on account of a protected ground for asylum purposes. The IJ then denied Petitioner's applications for asylum and withholding of removal under the INA.

The IJ also considered Petitioner's claim for protection under CAT. He noted that Petitioner had "suffered serious physical abuse by Ethiopian government agents," that he had been released from prison only because he agreed to work as a government spy, and that he had fled Ethiopia as soon as he was released from prison. The IJ found that it was likely that the Ethiopian government would still be interested in Petitioner based on its belief that he is an ONLF supporter and that it was more likely than not that Petitioner would be tortured by the Ethiopian government no matter where in that country he tried to settle. The IJ thus ordered that Petitioner's removal to Ethiopia be withheld pursuant to CAT. Petitioner timely appealed the denial of his application for asylum and withholding of removal under the INA.

On appeal, the BIA affirmed the IJ's conclusions. In a one-page decision, a single member of the BIA found that the IJ had "correctly applied the case law regarding terrorism investigations." It noted that the IJ had considered

Petitioner's "argument that the government arrested and harmed him for reasons other than suspected terrorist support" and that the IJ had "concluded that investigation of [Petitioner's] ties to ONLF was the only reason (i.e. there was no other reason, central or otherwise)" for his persecution. Finding no clear error in the IJ's determination, the BIA concluded that Petitioner did not meet his burden of proof for asylum or withholding of removal under the INA. Petitioner timely sought review in this court.

## II.

### A.

Generally, we review only the final decision of the BIA. *Zhu v. Gonzales*, 493 F.3d 588, 593 (5th Cir. 2007). When, as in the present case, the BIA's decision is affected by the IJ's ruling, however, we also review the IJ's decision. *Id.* We review the legal conclusions of the IJ and the BIA de novo, and we review their factual findings for substantial evidence. *Majd v. Gonzales*, 446 F.3d 590, 594 (5th Cir. 2006). Under the substantial evidence standard, "the BIA's finding is conclusive unless, based on the evidence presented in the record, any reasonable adjudicator would be compelled to conclude to the contrary." *Martinez-Martinez v. Holder*, 769 F.3d 897, 899 (5th Cir. 2014).

### B.

Petitioner challenges the IJ's denial of his asylum application, arguing that the IJ made legal errors when reaching this conclusion and that substantial evidence did not support a finding that he failed to meet the requirements of 8 U.S.C. § 1158. Under § 1158(b)(1), the Attorney General has the discretion to grant asylum to refugees who meet certain requirements. "To establish that the applicant is a refugee within the meaning of [§ 1101(a)(42)(A)], the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at

least one central reason for persecuting the applicant."[1] 8 U.S.C. § 1158(b)(1)(B)(i). "[A]lthough a statutorily protected ground need not be the only reason for harm, it cannot be incidental, tangential, superficial, or subordinate to another reason for harm." *Sharma v. Holder*, 729 F.3d 407, 411 (5th Cir. 2013) (alteration in original) (quoting *Shaikh v. Holder*, 588 F.3d 861, 864 (5th Cir. 2009)).[2] However, the BIA recognizes actionable mixed motive cases, where persecutors may have legitimate reasons for their actions, but an additional central reason for their actions is persecution on account of a protected category. *See In Re S-P-*, 21 I. & N. Dec. 486, 492 (BIA 1996).

Petitioner argues that the IJ erred in concluding that "the Ethiopian government took actions against the respondent only because it [was] attempting to suppress the violent activities of the ONLF" and it believed that Petitioner was supporting the ONLF and knew other supporters that he could reveal to the government. Petitioner argues that there was not substantial evidence to support a finding that he was solely persecuted on account of the government's investigation into the ONLF, because evidence supported that another central reason for the persecution was his ethnic or familial membership.[3] Petitioner also asserts that persecution on account of a mistaken belief that he was a supporter of the ONLF is persecution on account of imputed political opinion. Finally, Petitioner argues that the IJ made a legal error by not considering several factors that suggest that the terrorism investigation was pretext for persecution on account of another central reason.

---

[1] The IJ and the BIA did not address whether Petitioner established a well-founded fear of persecution as required to be eligible for asylum. *See Abdel-Masieh v. INS*, 73 F.3d 579, 583–84 (5th Cir. 1996).

[2] Congress passed the REAL ID Act in 2005 and clarified that "on account of" means "one central reason for." 8 U.S.C. § 1158(b)(1)(B)(i).

[3] The IJ "assume[d] arguendo that both of these claimed groups are particular social groups within the meaning of the Act, and that [Petitioner was] a member of both of those groups."

Determining "[a] persecutor's actual motive" when considering whether an alien is eligible for asylum is a factual finding. *In re N-M-*, 25 I&N Dec. 526, 532 (BIA 2011). Therefore, we review for substantial evidence the IJ's determination that the persecutor was solely motivated by a legitimate suspicion of Petitioner's being an ONLF supporter. *See Majd*, 446 F.3d at 594. "[W]e nevertheless may reverse a decision that was decided on the basis of an erroneous application of the law." *Mikhael v. INS*, 115 F.3d 299, 305 (5th Cir. 1997).

## C.

The IJ and the BIA ultimately concluded that Petitioner was not persecuted on account of a protected ground because the Liyu police were solely investigating terrorism. As the BIA characterized it, "The [IJ] concluded that the harm respondent suffered was not persecution because it occurred during a terrorism investigation." Importantly, the IJ fully credited Petitioner's testimony, which included the assertions that the Liyu police suspects all Ogaden clan members of being ONLF members and that Petitioner does not support the ONLF and does not know any members of the ONLF.

As noted by the IJ, this court has frequently upheld the BIA's conclusion that an alien was mistreated solely on account of a terrorist investigation. *See Mwembie v. Gonzalez*, 443 F.3d 405, 414 (5th Cir. 2006); *Ozdemir v. INS*, 46 F.3d 6, 8 (5th Cir. 1994); *Perez v. INS*, No.94-40491, 1995 WL 313962, at *1 (5th Cir. May 5, 1995) (unpublished). However, in each of those cases, the record supported that the investigation into terrorism was legitimate, and substantial evidence did not support that an additional central reason for the mistreatment was persecution on account of a protected ground. *See also In re R-*, 20 I. & N. Dec. 621, 624 (BIA 1992) ("[T]here is no indication that the police actions against the applicant extended beyond the investigation of and reaction against those thought–rightly or wrongly–to be militants seeking the violent

overthrow of the government."). Moreover, this court has recognized that "excessive or arbitrary" punishment for criminal conduct can qualify as persecution. *Abdel-Masieh v. INS*, 73 F.3d 579, 584 (5th Cir. 1996).

The BIA recognizes a distinction between legitimate investigation and what is instead pretext for persecution. In cases where this distinction must be made, "it is not an easy task to evaluate an asylum applicant's claim that harm was inflicted because of [a protected ground] rather than a desire to obtain intelligence information," and "there may have been . . . a combination of these motives." *In re S-P-*, 21 I&N Dec. at 493. In *S-P-*, the BIA listed several factors for courts to consider when determining the motive of a persecutor:

> 1. Indications in the particular case that the abuse was directed toward modifying or punishing opinion rather than conduct . . . ;
> 2. Treatment of others in the population who might be confronted by government agents in similar circumstances;
> 3. Conformity to procedures for criminal prosecution or military law including developing international norms regarding the law of war;
> 4. The extent to which antiterrorism laws are defined and applied to suppress political opinion as well as illegal conduct . . . ;
> 5. The extent to which suspected political opponents are subjected to arbitrary arrest, detention, and abuse.

*Id.* at 494.[4] In *S-P-*, the alien was detained in a prison for six months following accusations that he was involved in the ongoing conflict with a liberation group

---

[4] While *S-P-* specifically addressed whether the alien was persecuted on account of an imputed political opinion, "political opinion" could be replaced with any of the § 1158(b)(1)(B)(i) protected grounds. Contrary to the Government's position, the BIA has held that the REAL ID Act only altered how central the motive must be and not how the court determines what the persecutor's motive was. *In re J-B-N- & S-M-*, 24 I&N Dec. 208, 212–14 (BIA 2007) (citing *S-P-* with approval and noting that when Congress enacted the Act, it cited a Fifth Circuit mixed motive case, *Girma v. INS*, 283 F.3d 664 (5th Cir. 2002), with approval). This court has accepted the BIA's interpretation of the REAL ID Act. *Shaikh*, 588 F.3d at 864. It is in this context that we must read our statement in an unpublished decision: "[T]he 'mixed motives' doctrine was altered by the passage of the REAL ID Act, which

and a recent attack. *Id.* at 487. During that time, he was often tortured and threatened with death. Despite the facts that there was ongoing civil strife, the government accused the petitioner of being a member of a terrorist group, and the government questioned him about the identity and location of members of that group, the court noted that "the harm inflicted upon the applicant . . . went well beyond the bounds of legitimate questioning for intelligence gathering." *Id.* at 495. Differentiating between persecution and a legitimate investigation, the BIA considered the length of the questioning, the nature of the questions, the harm suffered, and the broader context of the conflict. *Id.* When holding that the petitioner was persecuted on account of an imputed political opinion, the BIA also emphasized that young males of petitioner's ethnicity were often targeted as suspects. *Id.* at 495.

Despite the similarities to *S-P-*, in Petitioner's case, the IJ did not consider that the investigation could have been pretext for persecution or that the investigators could have had multiple central motivations for their actions. The IJ also did not recognize any distinction between Petitioner's case and the cases in which this court has affirmed findings that the sole motivation for the harm and detention was a legitimate investigation into criminal activity.

The IJ did not consider evidence which suggests that this terrorist investigation may have been pretext for persecution, despite the fact that the IJ credited Petitioner's testimony. Petitioner testified that the Ethiopian government suspected all Ogaden clan members to be ONLF members, including business owners in Fik and anyone that did not support the government. The record also established that there are few judicial protections for those accused of being associated with the ONLF and that protections for

---

amended a number of provisions of the Immigration and Nationality Act." *Haile v. Holder*, 496 F. App'x 459, 460–61 (5th Cir. 2012)

those not charged with illegal conduct are often ignored. Petitioner was never criminally charged for illegally supporting the ONLF, but he was held in custody for two months. In addition, Petitioner's uncle and father were both detained and killed, and petitioner's grandfather remains detained, all without ever being charged for illegal conduct. There was also no evidence of a recent ONLF terrorist attack in Petitioner's region. Had the IJ properly considered these factors, he may have concluded that the Liyu police in Fik typically acted without reasonable suspicion, beyond the bounds of clearly established laws, and not for the sole purpose of investigating illegal conduct.

The IJ also did not consider that the Ethiopian government's maltreatment of Petitioner went well beyond investigatory. Petitioner was accused of supporting the ONLF after he opened a grocery store that his father previously operated. Although the Liyu police originally suspected his father of supporting the ONLF through the store, Petitioner opened the store a year after his father's execution. Petitioner operated the store for only a month before he was arrested, and the Liyu police directly asked him "if he wanted to go the same way his father went." On this tenuous suspicion of support for a terrorist organization, Petitioner was detained for two months and violently tortured without ever being criminally charged. In addition, Petitioner was released only when he agreed to act as a spy for the government. Each of these factors distinguishes this case from previous cases where the record supported that the only central reason for the petitioner's mistreatment was a legitimate investigation into terrorism or criminal activity.

Contrastingly, in cases in which this court or the BIA has found a legitimate investigation to be the sole purpose of mistreatment, the alien was very closely linked to the terrorist group or criminal activity being investigated. In addition, those cases often involved lesser periods of persecution and active terrorist activity. *See Mwembie,* 443 F.3d at 414 (alien

was in the building at the time of an assassination and considered a suspect for murder); *Ozdemir*, 46 F.3d at 7 (alien participated in an anti-government demonstration, numerous terrorist incidents had occurred in the area, and the alien was detained for only three days); *Perez*, 1995 WL 313962, at *1 (alien was only questioned once and was accused of being a member of the guerilla group and having knowledge about the leader).

Petitioner's argument also finds support in a June 24, 2015 unpublished BIA decision in which a three-judge panel discredited the Liyu police's investigation into the ONLF. In that case, which Petitioner submitted to this court in a 28(j) letter, the BIA relied on *S-P-* and distinguished this court's decisions noted above. The BIA considered the Liyu officers' treatment of the petitioner and the petitioner's relatives and the "brutal" campaign against anyone the Liyu police believed to be associated with the ONLF. Concluding that the petitioner was persecuted on account of imputed political opinion, the BIA noted that "there is evidence in the record that the government targets the Ogaden local population as suspected ONLF followers, and evidence that these suspected individuals are persecuted for their imputed anti-government political opinion." This BIA decision supports our conclusion that the IJ must properly consider whether the very similar investigation in this case was only motivated by a legitimate suspicion of Petitioner's support of the ONLF.

Because the BIA did not consider whether the Liyu police's investigation was legitimate or pretextual, the BIA concluded that Petitioner was not persecuted on account of a protected ground. The IJ erred by not conducting the mixed motive analysis described above, and the IJ's reasoning cannot be reconciled with *S-P-* and other cases describing factors that should be considered when determining an alleged persecutor's true motives. As a result, we remand for the BIA to examine the record "in light of the agency's own established standards for mixed motive claims." *Vumi v. Gonzales*, 502 F.3d

150, 159 (2d Cir. 2007) (directing the BIA to apply *S-P-*); *see INS. v. Orlando Ventura*, 537 U.S. 12, 17 (2002) (encouraging courts to "giv[e] the BIA the opportunity to address the matter in the first instance in light of its own expertise"); *Diaz-Resendez v. INS*, 960 F.2d 493, 498 (5th Cir. 1992); *Menghesha v. Gonzales*, 450 F.3d 142, 147 (4th Cir. 2006) ("Thus, where, as here, the IJ misapplies the law in evaluating a request for asylum, the appropriate remedy is to remand so that the agency may apply the correct legal standard in the first instance."); *Hirpa v. Holder,* 327 F. App'x 265, 268 (2d Cir. 2009) ("Accordingly, because the agency failed to consider the political context of Hirpa's alleged persecution, we remand to give the BIA the opportunity, in the first instance, to properly analyze Hirpa's claim.").

Because the basis of the Liyu police's maltreatment is unclear, on remand, the BIA should determine whether one central reason for the Liyu police's maltreatment was on account of his political opinion, his ethnicity, or his family,[5] *Sharma*, 729 F.3d at 411—especially given that three other members of Petitioner's family were detained or killed before Petitioner and that the Liyu police's belief that Petitioner was supporting the ONLF was mistaken. If the BIA concludes that Petitioner was persecuted on account of a protected ground, the BIA should then determine whether Petitioner established a well-founded fear of persecution. *See Abdel-Masieh*, 73 F.3d at 583–84. However, we note that the BIA did find that Petitioner "suffered serious physical abuse by Ethiopian government agents" entitling him to CAT protection, and this court has held that proving "torture" under CAT is a more

---

[5] Family background is not an enumerated protected ground under the INA. We note that each court that has addressed the issue has concluded that family background can constitute a particular social group under the INA. *Crespin-Valladares v. Holder*, 632 F.3d 117, 125 (4th Cir. 2011) (citing *Al–Ghorbani v. Holder*, 585 F.3d 980, 995 (6th Cir. 2009), *Ayele v. Holder*, 564 F.3d 862, 869 (7th Cir. 2009), *Jie Lin v. Ashcroft*, 377 F.3d 1014, 1028 (9th Cir. 2004), and *Gebremichael v. INS*, 10 F.3d 28, 36 (1st Cir. 1993)).

stringent standard than "well-founded fear of persecution." *See Roy v. Ashcroft*, 389 F.3d 132, 140 (5th Cir. 2004); *see also Ighodaro v. Holder*, 354 F. App'x 152, 155 (5th Cir. 2009).

## III.

Because the IJ failed to consider factors central to determining whether the only reason for Petitioner's detention and maltreatment was a legitimate investigation into terrorism, we grant the petition for review and remand this case to the BIA for further proceedings consistent with this opinion.