# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-60711

United States Court of Appeals
Fifth Circuit

**FILED**
May 7, 2018

Lyle W. Cayce
Clerk

LESLY ODELIA CABRERA,

　　　　Petitioner

v.

JEFFERSON B. SESSIONS, III, U.S. ATTORNEY GENERAL,

　　　　Respondent

————————

Petition for Review of an Order of the
Board of Immigration and Appeals

————————

Before STEWART, Chief Judge, and JOLLY and WIENER, Circuit Judges.

CARL E. STEWART, Chief Judge:

On May 27, 2014, Lesly Odelia Cabrera , a native citizen of Honduras, fled to the United States and applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). The Immigration Judge ("IJ") denied all relief and Cabrera appealed to the Board of Immigration Appeals ("BIA"), alleging the IJ misapplied the law in determining her refugee status and denying relief. The BIA summarily dismissed the appeal. Cabrera now brings this petition for review. We deny in part and grant in part the petition for review.

No. 15-60711

## I.     BACKGROUND

Petitioner fled to the United States without authorization in 2014 fearing, according to her, that her political activism posed a threat to her life and that of her teenage son, Edwuard.[1]  Prior to coming to the United States, Cabrera lived in a poor, crime-afflicted neighborhood in Choloma, Honduras. As in much of the country, Honduras's large and powerful gangs—including MS-13 or "the Maras" and their rivals, Barrio 18—are ubiquitous in Choloma. According to Cabrera, the Maras murdered several members of her family, including her cousin, nephew, and two brothers-in-law.

Cabrera says that she became politically active against the gangs and the governing political party in March 2012.  That month, the Maras approached then-fifteen-year-old Edwuard as he was leaving school, robbed him, and demanded that he join the gang.  When he refused, they beat him and threatened him at knifepoint, telling him that they would kill him if he did not change his mind.  Prior to Edwuard's attack, the Maras raped, beat, and murdered a female classmate who refused to join the gang. They dumped her body in front of the school "for all to see."  The incident was reported to the police who took no action.  Dismayed that anyone had reported their crime at all, according to Cabrera, the Maras "sent out a warning to the community— anyone who speaks out against them will be physically assaulted or worse."

After Edwuard's assault, Cabrera joined a parents' group at his school. The group began staging public protests in front of the police station and in the central park, demanding that the police provide protection at the school. Although the police eventually agreed to send a patrol car, their presence

---

[1] Edwuard entered the United States at the same time as Cabrera.  His case was administratively closed, and Cabrera has stated that Edwuard will remain in the United States if she is removed to Honduras.

2

lasted only a week or two, after which the parents' group stood watch throughout the day. Cabrera testified that she guarded the school twice a week from 2012 until the time she left Honduras in 2014.

In addition to organizing protests with the parents' group, Cabrera joined the Libertad y Refundacion Party ("LIBRE"), a political party opposed to the Maras and current government inaction and corruption. According to one study Cabrera presented to the IJ, the "LIBRE party pre-candidates, candidates, their families, and campaign leaders have suffered more killings and armed attacks than all other political parties combined." Cabrera campaigned on behalf of the party and supported the LIBRE candidate for mayor of Choloma. In October 2013, the Maras robbed Juan Pena, the president of Cabrera's parents' group and fellow LIBRE party member, threatening him and demanding that he leave the neighborhood. Pena, like Cabrera, had been posting pro-LIBRE signs around Choloma.

In 2014, gang members robbed Cabrera. Fearing she and Edwuard "may be harmed as a result of [her] protests against the Maras' actions" and her "denouncement of the government's inaction and corruption," she decided that they "would just stay home." Eventually, Cabrera grew "tired of feeling like a prisoner in [her] own home" and traveled to the United States with Edwuard in May of 2014.

After arriving in the United States, Cabrera applied for asylum, withholding of removal, and relief under the CAT. Her claims were based on her political opinion and her membership in a particular social group ("PSG") described as female human rights defenders from Honduras. Cabrera testified that she was "afraid that if [she goes] back [to Honduras], [she] would be immediately identified and . . . harmed, [kidnapped] or even killed by the

Maras." She also explained that returning to Honduras and relocating within the country is not a possibility because she would always be in danger.[2]

In addition to her own testimony, Cabrera presented unchallenged testimony from Dr. Thomas Boerman, a recognized expert on Honduran gangs, including "their culture, sociology, and psychology . . . and factors that affect the Honduran government's ability and willingness to respond to crime and violence." Dr. Boerman has traveled to Choloma on several occasions and describes it as "a community that has been ravaged by gang violence." He testified that the government is unable and unwilling to prevent gang violence against "activists and human rights defenders" or others who challenge the gangs. Dr. Boerman explained that violent criminal gangs and related government corruption are pervasive in Honduras and asserted that Cabrera's participation in public protests, her support of the LIBRE party, and her gender put her at a particular risk of harm. According to Dr. Boerman, "[t]he Honduran government acknowledges that organized criminal groups have infiltrated state institutions—includ[ing] the police, military and judiciary." The Vice-President of the Honduran National Congress disclosed that "[forty] percent of the country's police officers are directly linked to organized crime."[3]

---

[2] According to Cabrera's expert, Dr. Thomas Boerman, "Honduras is a very small country. It's roughly the size of Virginia and much of that national territory is uninhabited, it's mountainous, there[ are] no roads, there's no access to it. So, the population is concentrated into a very, very small area."

[3] Cabrera also provided numerous supporting documents, including the United Nations Report of the Special Rapporteur, which stated:

Owing to the exposed nature of their activities, human rights defenders and their families continue to be vulnerable to extrajudicial executions, enforced disappearance, torture and ill-treatment, arbitrary arrest and detention, death threats, attacks, surveillance, harassment, stigmatization, displacement and enforced exile. . . . Such violations are commonly attributed to law enforcement authorities. However, collusion and/or acquiescence has also reportedly been shown with regard to abuses committed by private actors, inter alia, criminal

No. 15-60711

Dr. Boerman concluded that in his professional opinion "[Cabrera] may be at risk of egregious physical harm if returned to Honduras, and that it is utterly implausible to conclude that the Honduran government would be able or willing to provide her even a modicum of protection against this threat."

Although the IJ made no adverse findings regarding Cabrera's credibility, he denied all relief and ordered Cabrera removed to Honduras, concluding that Cabrera "ha[d] not been persecuted in the past" where "one central reason" for the persecution was "either her activities against the gangs or against the violation of human rights." The IJ also found no indication that "one central reason" for Cabrera's being robbed in 2014 was her "activity against the gangs . . . or her participation in any political demonstrations or groups." He instead found that her fear and her attackers' motivations were both based in the general criminality of Honduras. Accordingly, the IJ concluded Cabrera had not suffered past persecution on account of any factor that would qualify her for asylum.

As to the likelihood of future persecution, the IJ noted "that gangs can be expected to react viciously and violently against anyone who defies them." The IJ then determined – despite her own claim – Cabrera's group was actually "those who might defy gangs" and those people do not form a PSG. The IJ reasoned that "[t]o simply pick out one way in which a specific individual has defied a gang or disobeyed it and indicate that this has created a particular social group does not constitute evidence of such a group as distinct in

gangs and private security guards. The Special Rapporteur was repeatedly informed that impunity for such violations was a chronic problem.

Margaret Sekaggya, *Report of the Special Rapporteur on the Situation of Human Rights Defenders*, UNITED NATIONS 12–13 (Dec. 13, 2012), http://www.ecoi.net/file_upload/1930_1358957902_ahrc2247add-1-english.pdf.

5

No. 15-60711

Honduran society." The IJ thus concluded that Cabrera had "not demonstrated that the fear she has of the gangs in Honduras would be on account of any qualifying cause."

The IJ similarly rejected Cabrera's claim for withholding of removal on the ground that she had not "shown a clear probability of future persecution on account of any . . . qualifying cause." As to Cabrera's CAT claim, the IJ found no evidence to establish a "clear probability that she would be tortured by the government of Honduras or with its acquiescence."

Cabrera appealed to the BIA. The BIA – in a single member, two-page order – agreed with the IJ that Cabrera had not established the requisite likelihood of persecution based on a protected classification as was needed for asylum or withholding of removal. The BIA also adopted the IJ's reasoning that Cabrera was not entitled to CAT relief. Cabrera filed a timely petition for review.

## II.    DISCUSSION

We review the BIA's findings of fact for substantial evidence. *Sealed Petitioner v. Sealed Respondent*, 829 F.3d 379, 383 (5th Cir. 2016). That review includes the IJ's judgment to the extent it influenced the BIA's decision. *Id.* When the BIA summarily affirms the IJ's opinions, we review the factual findings and legal conclusions of the IJ. *Id.* Although we review factual findings for substantial evidence, questions of law are reviewed de novo. *Hernandez-De La Cruz v. Lynch*, 819 F.3d 784, 786 (5th Cir. 2016). "Substantial evidence is lacking only if the petitioner establishes that the record [is] 'so compelling that no reasonable fact finder could fail to find' the petitioner statutorily eligible for asylum or withholding of removal." *Eduard v. Ashcroft*, 379 F.3d 182, 186 (5th Cir. 2004) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 483–84 (1992)). However, we "may reverse a decision that was decided on the basis of an

No. 15-60711

erroneous application of the law." *Sealed Petitioner*, 829 F.3d at 384 (quoting *Mikhael v. INS*, 115 F.3d 299, 305 (5th Cir. 1997)).

## A.    Asylum

Cabrera challenges the IJ's denial of her asylum claim, arguing the IJ committed legal errors in determining her refugee status. The Immigration and Nationality Act authorizes the Attorney General to grant asylum to refugees.  8 U.S.C. § 1158(a); *Orellana-Monson v. Holder*, 685 F.3d 511, 518 (5th Cir. 2012). The statute defines a refugee as:

> Any person who is outside any country of nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself to the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

8 U.S.C. § 1101(a)(42).

This circuit has interpreted this to mean asylum is "available where 1) a person is 'unwilling to return to' their home country 'because of persecution *or* a well-founded fear of persecution'; and 2) the applicant has demonstrated that 'race, religion, nationality, membership in a particular social group, or political opinion was *or* will be at least one central reason for persecuting the applicant.'" *Tamara-Gomez v. Gonzales*, 447 F.3d 343, 348 (5th Cir. 2006) (emphasis added) (quoting 8 U.S.C. §§ 1101(a)(42), 1158(b)(1)(B)(i)); *see also* 8 C.F.R. § 208.13(b). Thus, a petitioner must prove that she was persecuted in the past on account of one of the five statutory grounds *or* that she has a well-founded fear of being persecuted in the future because of one of those grounds. *See Eduard*, 379 F.3d at 187–92. "[A]lthough a statutorily protected ground need not be the only reason for harm, it cannot be incidental, tangential, superficial, or subordinate to another reason for harm." *Sealed Petitioner*, 829

F.3d at 383 (alteration in the original) (quoting *Sharma v. Holder*, 729 F.3d 407, 411 (5th Cir. 2013)).

The BIA agreed with the IJ's finding that Cabrera did not prove that her previous attack was on account of any of the five statutorily protected grounds. Cabrera did not challenge this finding. However, despite finding adversely on claims of past persecution, the IJ must determine whether the petitioner demonstrated a well-founded fear of future persecution if asserted. *See Eduard*, 379 F.3d at 188, 192. In the inquiry here, however, the IJ required Cabrera to show that she was persecuted in the past to establish that her fear was well-founded. It is well-established in this circuit that requiring a showing of past persecution to support a well-founded fear of future persecution is an erroneous application of the law. *See id.* ("[R]equiring an applicant to prove past targeting to establish a well-founded fear would effectively replicate the past persecution inquiry."); *see also Zhao v. Gonzales*, 404 F.3d 295, 308 (5th Cir. 2005) ("[T]he test does not require [the petitioner] to prove that he had been personally targeted, because such an interpretation would render the future persecution inquiry redundant of the past persecution analysis.").

"To show a well-founded fear of persecution, an alien must have subjective fear of persecution, and that fear must be objectively reasonable." *Eduard*, 397 F.3d at 189. The subjective fear must have a nexus to one of the five statutory grounds. *See id.* at 189. In determining whether the petitioner has a valid subjective fear, the IJ "may weigh the credible testimony along with other evidence of record." *See* 8 U.S.C. § 1158(b)(1)(B)(ii). If the petitioner's testimony is credible and refers to sufficient specific facts, a petitioner's testimony may be sufficient to demonstrate she is a refugee. *Id.*; *see also Zhao*, 404 F.3d at 300, 309 (using the petitioner's credited testimony to establish facts

supporting fear of future persecution when the IJ made no adverse findings regarding the petitioner's credibility).

Proving that fear is objectively reasonable, as this circuit previously stated, "does not require an applicant to demonstrate that he *will* be persecuted in his native country; rather the applicant must 'establish, to a "reasonable degree," that return to his country of origin would be intolerable.'" *Eduard*, 379 F.3d at 189 (emphasis added) (quoting *Mikhael*, 115 F.3d at 305); *see also Zhao*, 404 F.3d at 307 ("This standard, however, does not require [the petitioner] to demonstrate that he *will* be persecuted on returning to [his country of nationality]. It requires a lesser showing . . . ."). Furthermore, the plain language of the Code states that an IJ "shall not require" a petitioner to prove "she would be singled out individually" if:

> (A) The applicant establishes that there is a pattern or practice in his or her country of . . . persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and
>
> (B) The applicant establishes his or her own inclusion in, and identification with, such group of persons such that his or her fear of persecution upon return is reasonable.

8 C.F.R. 208.13(b)(2)(iii). Thus, if a petitioner does not prove that she will be "singled out individually" in the future, she may still be eligible for asylum if she establishes there is a practice of persecution against a group of which she is so identifiably included that fear of her own persecution is reasonable. *See id.*; *see also Zhao*, 404 F.3d at 307 ("There are therefore two different ways for [the petitioner] to prove the objectivity of his claim."); *Wakkary v. Holder*, 558 F.3d 1049, 1060 (9th Cir. 2009) ("In the asylum context, the INA's implementing regulations map out two routes by which an asylum-seeker can show that the objective risk of future persecution is high enough to merit relief."); *Sugiarto v. Holder*, 586 F.3d 90, 97 (1st Cir. 2009) ("[A]n applicant

need not provide evidence of a "reasonable possibility" of being "singled out individually for persecution" in the event that the applicant establishes "a pattern or practice" in her country of persecution of "a group of persons similarly situated to the applicant" on account of a protected ground." (quoting 8 C.F.R. 208.13(b)(2)(iii)(A))).

To prove her fear is objectively reasonable a petitioner must prove:

(1) [s]he possesses a belief or characteristic a persecutor seeks to overcome by means of punishment of some sort; (2) the persecutor is already aware, or could become aware, that the alien possesses this belief or characteristic; (3) the persecutor has the capability of punishing the alien; and[] (4) the persecutor has the inclination to punish the alien.

*Eduard*, 379 F.3d at 191 (citing *Matter of Mogharrabi*, 19 I. & N. Dec. 439, 446 (BIA 1987)). Cabrera asserted that she maintained a fear of future persecution on account of her political opinion and her membership in a particular social group.

## 1.    Political Opinion

"To demonstrate persecution 'on account of' political opinion, the burden is on the alien to prove [her] 'political opinion was or will be at least one central reason for persecuting the applicant.'" *Milat v. Holder*, 755 F.3d 354, 360 (5th Cir. 2014) (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). Cabrera defined her political opinion as pro rule-of-law, anti-corruption, and anti-gang. The IJ determined that Cabrera likely had a subjective fear of persecution but found that it was not objectively reasonable for Cabrera to fear persecution given that she had not been persecuted in the past for her political activism. In the IJ's opinion, Cabrera did nothing "during her time in Honduras for which she was specifically retaliated against" and "there was no action taken against" her as a result of her increased activity. Although the IJ misapplied the law in requiring Cabrera to show past persecution, we affirm nonetheless; substantial

evidence does not compel a different result because the record supports the finding that there was no pattern of persecution against similarly situated individuals because of their political opinion.

Cabrera pointed to multiple acts that she asserted established a pattern of persecution against others like her because of their political opinion. Cabrera became involved in LIBRE, a political party which opposed the current government, corruption, and gang activity. She claimed LIBRE members were specifically persecuted because of their political opinions. She asserted that the president of the parents' group associated with LIBRE was robbed and his life was threatened for openly supporting LIBRE in the neighborhood. However, the record supported the finding that the man was not targeted because of his political affiliation but because, as Cabrera stated, "[the Maras] charged a war tax in the places . . . they controlled."

Cabrera also provided a list of individuals who were killed or attacked as a result of their political activity. LIBRE was disproportionately represented; although it was one of eight political parties, fifty-five percent of the known attacks were against LIBRE members. However, the study accompanying the list acknowledged the list's limitations: the list was incomplete; it did not include those who were not candidates, but were deeply involved in the campaign; and fear of further persecution led to underreporting politically-motivated attacks. That those listed were candidates, pre-candidates, or their relatives undercuts Cabrera's claims. Cabrera was not, nor was she related to, a candidate or pre-candidate. Thus, this list does not show a pattern of persecution against those similarly situated to Cabrera because of their political opinion.

Lastly, Dr. Boerman provided testimony that his research illuminated that LIBRE party members expressed fear of retaliation as a result of their

political opinion and had taken steps to further ensure their security. However, the expert's opinion fails to compel a different result because this subjective fear was insufficient to show a pattern of actual persecution against similarly situated LIBRE party members. Thus, substantial evidence supports the IJ's finding that Cabrera failed to establish a well-founded fear of persecution based on her political opinion.

## 2. Particular Social Group

Cabrera also asserted that she maintained a fear of future persecution on account of her membership in a particular social group. However, the IJ failed to consider the PSG of which Cabrera asserted she was a member. The IJ found that, although she had subjective fear, Cabrera could not point to a time where she was specifically retaliated against for her activism. He added that her fear of retaliation was only speculative and simply indicative of the characteristics of Honduras.

We review the BIA's decision "'procedurally' to ensure that the complain[ant] has received full and fair consideration of all circumstances that give rise to his or her claims." *Abdel-Masieh v. INS*, 73 F.3d at 579, 585 (5th Cir. 1996) (quoting *Zamora-Garcia v. INS*, 737 F.2d 488, 490 (5th Cir. 1984). The BIA's decision must reflect a meaningful consideration of all the relevant evidence supporting an asylum seeker's claims. *See id.* at 584–85; *see also Woldu v. Gonzales*, 209 F. App'x 380, 381 (5th Cir. 2006) (unpublished). "We do not require the BIA to specifically address every piece of evidence put before it," but it is error for the agency to "fail[] to address . . . key evidence." *See Abdel-Masieh*, 73 F.3d at 585.

The IJ failed to consider whether Cabrera belonged to the PSG she alleged and whether she had a well-founded fear of persecution on account of that membership. In order to prove membership in a particular social group,

the BIA established – and this circuit accepted – a test that questions: "(1) 'whether the group's shared characteristic gives the members the requisite social visibility to make them readily identifiable in society' and (2) 'whether the group can be defined with sufficient particularity to delimit its membership.'" *Orellana-Monson*, 685 F.3d at 519 (quoting *In re A-M-E- & J-G-U-*, 24 I. & N. Dec. 69, 69 (BIA 2007)); s*ee also Hernandez-De La Cruz*, 819 F.3d at 786.

It is not usual that an IJ fails to evaluate the claim before it, and this circuit has not decided a case under these particular circumstances where instead of evaluating the presented PSG, the IJ posits and evaluates his own. However, similar facts can be found in other circuits. *See Rios v. Lynch*, 807 F.3d 1123, 1126 (9th Cir. 2015) (IJ erroneously evaluated the PSG as witnesses against gangs instead of a particular family that was targeted by gangs); *Crespin-Valladares v. Holder*, 632 F.3d 117, 125 (4th Cir. 2011) (IJ erroneously evaluated the PSG as those who oppose gangs instead of those who suffer persecution because they are related to prosecutorial witnesses); *Valdiviezo-Galdamez v. U.S. Att'y Gen.*, 502 F.3d 285, 290–91 (3d Cir. 2007) (IJ "curious[ly]" failed to evaluate the PSG altogether, instead summarily concluding the petitioner's attacks had "no nexus to a protected ground"). In *Crespin-Valladares*, the petitioners claimed they feared persecution on account of their being family members of prosecutorial witnesses who agreed to testify against El Salvadorian gangs. 632 F.3d at 125. The BIA instead identified the group as "those who actively oppose gangs in El Salvador" and concluded that group did not constitute a cognizable social group. *Id.* The Fourth Circuit found that the BIA committed legal error in concluding that the petitioners were not members of a particular social group because "the family provides 'a prototypical example of a "particular social group."'" *Id.* (quoting *Sanchez-*

*Trujillo v. INS*, 801 F.2d 1571, 1576 (9th Cir. 1986)). That error, according to the court of appeals, flowed from the IJ's error in "reject[ing] a group different from that which the Crespins proposed." *Id.*

Here, Cabrera identified her group as female activists or human rights defenders from Honduras who actively protest the Maras. The IJ instead identified her group as "those who might defy gangs." The IJ did not consider her identified status as a woman and the role her gender played in her feared persecution. Dr. Boerman provided evidence that not only were individuals who opposed the governing party attacked, but the likelihood increased when the person presenting opposition was a woman. He noted that unmarried women were considered "low-hanging fruit," so defiant women and girls were raped by multiple gang members simultaneously, and their bodies or body parts were put on display to send a message.[4] Additionally, Cabrera provided reports from the U.S. State Department, the United Nations, and Human Rights Watch supporting those assertions. However, the IJ did not consider the expert's evidence regarding politically active women. Instead, the IJ determined that Cabrera feared the general gang activity that was consistent

---

[4] Dr. Boerman explained that if a woman, particularly a single woman like Cabrera,

challenges a gang member[,] the gang will victimize [her] in ways not only to punish her as an individual, but [to] send . . . horrifically graphic messages to the larger community that says, if you women rebuff us, challenge us, confront us, this is what you can expect[,] and in fact . . . one tactic that's just hideous beyond comprehension . . . that gangs very commonly employ is one . . . that I call torture rape. Torture rape involves, number one, multiple assailants, number two . . . extremes of cruelty and very often ends in the murder and the dismemberment of the victim with her body parts scattered around soccer fields or on her family's door step. It's done, and it's done quite frequently, as means of conveying this message that if you woman challenge us, this is what you can expect. So, there are some unique risks that . . . relate very specifically to [Cabrera's] status as a woman and a single unprotected woman in particular.

in various Central American countries and stated he did "not believe that this would create a particular social group encompassing all of those who might defy gangs."

The IJ never evaluated whether Cabrera described this group with particularity. The IJ did not analyze whether members of the group shared common immutable traits. The judge only stated that those who defy gangs are not a distinct group in Honduran society. This was erroneous and a failure to comply with the agency's own standards and responsibilities and provide a meaningful consideration of all the relevant and substantial evidence supporting Cabrera's fear of future persecution claim. *See Abdel-Masieh*, 73 F.3d at 585 ("[The BIA's] decision must reflect a meaningful consideration of the relevant substantial evidence supporting an alien's claims."); *see also In re Argueta*, 2003 WL 23521910, at *1 (BIA Nov. 14, 2003) (unpublished) (finding the IJ erred in characterizing the applicant's claim as "related to . . . his sexual preference" when the applicant claimed membership in the social group "persons living with AIDS in Honduras," but dismissing the appeal because the applicant — who was ineligible for asylum — could not prove the heightened requirements for withholding of removal (omission in original)). As such, we must remand for the agency to comply with its established responsibility. *See Abdel-Masieh*, 73 F.3d at 585 ("Where an agency has failed to comply with its responsibilities, we should insist on its compliance rather than attempt to supplement its efforts." (quoting *Sanon v. INS*, 52 F.3d. 648, 652 (7th Cir. 1995))); *see also Rios*, 807 F.3d at 1126 ("The IJ's characterization misapprehended [the petitioner]'s complaint . . . . The BIA did not address this social group claim—a failure that constitutes error and requires remand."); *Valdiviezo-Galdamez*, 502 F.3d at 290 ("[N]either the IJ nor the BIA decided whether the group of which [the petitioner] claims to be a member . . . is a

'particular social group' within the meaning of the Act. We decline to decide this question in the first instance.").

## B.    **Withholding of Removal & Convention Against Torture**

The IJ rejected Cabrera's claim for withholding of removal on the ground that she had not "shown a clear probability of future persecution on account of any . . . qualifying cause." The "clear probability" standard requires a showing that it is more likely than not that Cabrera's life or freedom would be threatened by persecution on a protected ground. *See Roy v. Ashcroft*, 389 F.3d 132, 138 (5th Cir. 2004). This is a higher standard than asylum. *Id.* The BIA's conclusion that Cabrera did not meet this higher standard was supported by substantial evidence.

Additionally, the IJ's conclusion that Cabrera is not entitled to relief under the CAT was substantially reasonable based upon the evidence presented. Although the evidence suggests that Cabrera faces some likelihood of persecution if she returns to Honduras, it is not sufficient to "compel" a different result. *See Garcia v. Holder*, 756 F.3d 885, 890 (5th Cir. 2014); *Roy*, 389 F.3d at 137–38 (quoting 8 U.S.C. § 1252(b)(4)(B)).

## III.    CONCLUSION

In sum, we hold that the BIA erred in requiring Cabrera to prove past persecution to establish a claim based on a well-founded fear of future persecution; and, second, in recharacterizing Cabrera's claimed social group. In all other respects, the decision of the BIA is affirmed.

Accordingly, Cabrera's petition for review is DENIED, in part, and GRANTED, in part, and the case is REMANDED for further proceedings not inconsistent with this opinion.